**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE-OPELOUSAS DIVISION**

| | |
|---|---|
| ARTHUR SAMPSON, JR. and<br>CONNIE NICHOLS, Individually and on<br>behalf of others similarly situated | CIVIL ACTION NO. 6:19-CV-00896 |
| VERSUS | JUDGE JAMES D. CAIN, JR. |
| USAA CASUALTY INSURANCE<br>COMPANY | |
| | MAGISTRATE CAROL B.WHITEHURST |

**MEMORANDUM IN SUPPORT OF**
**<u>DEFENDANT USAA CASUALTY INSURANCE COMPANY'S MOTION TO DISMISS</u>**

**<u>TABLE OF CONTENTS</u>**

I.   INTRODUCTION AND SUMMARY OF THE ARGUMENT .........................................1

II.  STATEMENT OF FACTS .................................................................................................2

    A.   Allegations Related to Sampson's Vehicle and Claim ............................................2

    B.   Allegations Related to Nichols' Vehicle and Claim ................................................4

III. STANDARD OF REVIEW .................................................................................................6

IV.  ARGUMENT........................................................................................................................7

    A.   Plaintiffs Have Not Adequately Alleged A Violation of the Louisiana
        Insurance Code........................................................................................................8

    B.   Plaintiffs Have Not Adequately Alleged They Sustained Any Damages.................9

V.   CONCLUSION..................................................................................................................12

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................. 6, 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................. 6, 11

*Dep't of Motor Vehicles & Pub. Safety v. Hutchings*,
    795 P.2d 497 (Nev. 1990) ........................................................................................................ 9

*FTC v. CCC Holdings, Inc.*,
    605 F.Supp.2d 26 (D.D.C. 2009) ......................................................................................... 9, 10

*Kane Enterprises v. MacGregor (USA) Inc.*,
    322 F.3d 371 (5th Cir. 2003) .................................................................................................. 2, 3

*Lone Star Fund V (US), L.P. v. Barclays Bank PLC*,
    594 F.3d 383 (5th Cir. 2010) ...................................................................................................... 7

*In re Mayland*,
    No. 06-10283, 2006 Bankr. LEXIS 967 (Bankr. M.D.N.C. May 26, 2006) ........................... 10

*McDaniel v. Chevron Corp.*,
    203 F.3d 1099 (9th Cir. 2000) ................................................................................................... 9

*In re Nance*,
    477 B.R. 638 (Bankr. E.D. La. 2012) ..................................................................................... 10

*U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*,
    355 F.3d 370 (5th Cir. 2004) ..................................................................................................... 7

*In re Scott*,
    437 B.R. 168 (Bankr. D.N.J. 2010) ........................................................................................ 10

*United States ex rel. Siller v. Becton Dickinson & Co.*,
    21 F.3d 1339 (4th Cir. 1994) ..................................................................................................... 9

*In re Zambuto*,
    437 B.R. 175 (Bankr. D.N.J. 2010) .......................................................................................... 8

**Rules**

Fed. R. Civ. P. 10(c) ................................................................................................................... 2, 3

Federal Rules of Civil Procedure Rule 12(b)(6) ................................................................... 1, 6, 12

Defendant USAA Casualty Insurance Company ("Defendant" or "USAA CIC") submits this Memorandum in Support of its Motion to Dismiss the Complaint filed by Plaintiff Arthur Sampson, Jr. and Plaintiff Connie Nichols (collectively, "Plaintiffs"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## I.     **INTRODUCTION AND SUMMARY OF THE ARGUMENT**

This lawsuit involves a dispute over whether Defendant adequately compensated Plaintiffs for the total loss of their vehicles. In February 2017, a vehicle owned by Plaintiff Arthur Sampson, Jr. was involved in a collision that rendered the vehicle, a 2012 Mazda 6 Sport, a total loss. In August 2016, Plaintiff Connie Nichols' vehicle, a 2011 Buick LaCrosse CXL, received flood damage that rendered it a total loss. Defendant, as Plaintiffs' auto insurer, adjusted and paid the losses. More than two years later, Plaintiffs brought this putative class action, alleging that Defendant underpaid their claims and seeking to represent a class of Louisiana policyholders insured by Defendant.

Plaintiffs' Complaint should be dismissed because it fails to state a claim upon which relief may be granted. The Complaint contains only conclusory statements—without any factual support—that the CCC Market Valuation Reports utilized by USAA CIC do not comply with the requirements of the Louisiana Insurance Code and that Plaintiffs sustained damages as a result. Because Plaintiffs do not include any specific factual allegations to support their claims, dismissal of the Complaint is warranted.

## II.   STATEMENT OF FACTS[1]

### A.   ALLEGATIONS RELATED TO SAMPSON'S VEHICLE AND CLAIM

On or about February 18, 2017, Plaintiff Arthur Sampson, Jr.'s vehicle was involved in a motor vehicle accident that rendered the vehicle a total loss. *See* Compl. ¶¶ 7-8. At the time of the accident, Sampson's vehicle was insured under an automobile policy issued by USAA CIC. *See* Exhibit A (*USAA CIC Automobile Insurance Policy 038342653G71013*, the "Sampson Policy").[2] Sampson made a claim under his policy. Compl. ¶ 8.

Defendant's payment obligations are governed by the terms of the Sampson Policy. In particular, Part D – Physical Damage Coverage of the Sampson Policy provides:

> **Insuring Agreement**
>
> B. Collision Coverage. We will pay for loss caused by collision to your covered auto, including its equipment, and personal property contained in your covered auto, minus any applicable deductible shown on the Declarations.
>
> * * *
>
> **Limit of Liability**
>
> A. Total loss to your covered auto. Our limit of liability under Comprehensive Coverage and Collision Coverage is the actual cash value of the vehicle, inclusive of any custom equipment, and the cost to transfer or replace any equipment, furnishings or parts designed to assist disabled persons.
>
> 1. The maximum amount we will include for loss to custom equipment in or on your covered auto is $5,000.
>
> 2. We will declare your covered auto to be a total loss if, in our judgment, the cost to repair it would exceed 75% of its actual cash

---

[1] For purposes of this Motion to Dismiss, Defendant discusses facts as alleged in the Complaint, but unless otherwise indicated, Defendant does not admit any allegations in the Complaint.

[2] Plaintiffs failed to attach their insurance policies to the Complaint despite referencing the policies and relying upon the policies as the basis for their claims. Defendant is entitled to attach the policies to its Motion to Dismiss because the policies are referenced in the Complaint and are central to Plaintiffs' claims. *See* Fed. R. Civ. P. 10(c); *Kane Enterprises v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003).

>> value immediately before the loss or would be greater than its actual cash value minus its salvage value after the loss.

Ex. A (Sampson Policy) at 2 of 3; 16 of 26.

The Sampson Policy defines "actual cash value" as follows:

>> "Actual cash value" means the amount that it would cost, at the time of loss, to buy a comparable vehicle. As applied to your covered auto, a comparable vehicle is one of the same make, model, model year, body type, and options with substantially similar mileage and physical condition.

Ex. A (Sampson Policy) at 15 of 26.

To adjust Sampson's claim pursuant to his policy, Defendant utilized a CCC Market Valuation Report ("CCC Report"). The CCC Report provided a Base Vehicle Value of $6,463.00 and an Adjusted Vehicle Value for Sampson's vehicle of $5,999.00.[3] Compl. ¶ 18. The CCC Report estimated the actual cash value of Sampson's vehicle by (i) identifying features of Sampson's vehicle, including location, mileage, equipment, and vehicle condition, including conditions based on observations of the vehicle's condition, Exhibit B (Sampson CCC Report) at 2-6; (ii) identifying six comparable vehicles listed for sale at car dealerships in the region, and adjusting the list prices of those comparable vehicles to account for differences between each comparable vehicle and Sampson's vehicle, including adjustments for vehicle options, mileage, and vehicle condition, to arrive at an adjusted comparable value for each vehicle, Ex. B (Sampson CCC Report) at 7-10; (iii) averaging the adjusted comparable vehicle values to arrive at an estimated base vehicle value of $6,463.00, Ex. B (Sampson CCC Report) at 2; and (iv) decreasing the base vehicle value by $464 to reflect the actual condition of Sampson's vehicle, to arrive at an adjusted vehicle value of $5,999.00 for Sampson's vehicle, Ex. B (Sampson CCC Report) at 1, 6.

---

[3] Plaintiffs included only an image of the first page of each CCC Report in their Complaint. Defendant is entitled to attach the full CCC Reports to its Motion to Dismiss because the CCC Reports are referenced in the Complaint and are central to Plaintiffs' claims. *See* Fed. R. Civ. P. 10(c); *Kane Enterprises v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003).

3

The CCC Report explains that the condition adjustment "sets the comparable vehicle to Good condition, which the loss vehicle is also compared to in the Vehicle Condition section." Ex. B (Sampson CCC Report) at 8-9. To the adjusted vehicle value Defendant added vehicular sales tax of $599.90, a title fee of $68.50, and a title handling fee of $8.00 and subtracted a collision deductible of $500.00, to arrive at a claim payment of $6,175.40.

### B. ALLEGATIONS RELATED TO NICHOLS' VEHICLE AND CLAIM

On or about August 13, 2016, Plaintiff Connie Nichols's vehicle received flood damage that rendered the vehicle a total loss. *See* Compl. ¶¶ 9-10. At the time of the flood damage, Nichols' vehicle was insured under an automobile policy issued by USAA CIC. *See* Exhibit C (*USAA CIC Automobile Insurance Policy 017463146G71015*, the "Nichols Policy"). Nichols made a claim under her policy (the "Nichols Policy"). Compl. ¶ 10.

Defendant's payment obligations are governed by the terms of the Nichols Policy. In particular, Part D – Physical Damage Coverage of the Nichols Policy provides:

> **Insuring Agreement**
>
> A. Comprehensive Coverage (excluding collision).
>
> 1. Physical damage. We will pay for loss caused by other than collision to your covered auto, including its equipment, and personal property contained in your covered auto, minus any applicable deductible shown on the Declarations. The deductible will be waived for loss to window glass that can be repaired rather than replaced. In cases where the repair proves unsuccessful and the window glass must be replaced, the full amount of the deductible, if any, must be paid.
>
> \* \* \*
>
> **Limit of Liability**
>
> A. Total loss to your covered auto. Our limit of liability under Comprehensive Coverage and Collision Coverage is the actual cash value of the vehicle, inclusive of any custom equipment, and the cost

4

> to transfer or replace any equipment, furnishings or parts designed to assist disabled persons.
>
> 1. The maximum amount we will include for loss to custom equipment in or on your covered auto is $5,000.
>
> 2. We will declare your covered auto to be a total loss if, in our judgment, the cost to repair it would exceed 75% of its actual cash value immediately before the loss or would be greater than its actual cash value minus its salvage value after the loss.

Ex. C (Nichols Policy) at 1-2 of 3.

The Nichols Policy also provides the following definition of "actual cash value":

> Actual cash value means the amount that it would cost, at the time of loss, to buy a vehicle of the same make, model, body type, model year, and equipment with substantially similar mileage and physical condition.

Ex. C (Nichols Policy) at 12 of 18.

The CCC Report used by Defendant provided a Base Vehicle Value and an Adjusted Vehicle Value for Nichols' vehicle of $11,340.00. Compl. ¶ 21. The CCC Report estimated the actual cash value of Nichols' vehicle by (i) identifying features of Nichols' vehicle, including location, mileage, equipment, and vehicle condition, including conditions based on observations of the vehicle's condition, Exhibit D (Nichols CCC Report) at 2-6; (ii) identifying five comparable vehicles listed for sale at car dealerships in the region, and adjusting the list prices of those comparable vehicles to account for differences between each comparable vehicle and Nichols' vehicle, including adjustments for vehicle options, mileage, and vehicle condition, to arrive at an adjusted comparable value for each vehicle, Ex. D (Nichols CCC Report) at 7-9; and (iii) averaging the adjusted comparable vehicle values to arrive at an estimated base vehicle value of $11,340.00, Ex. D (Nichols CCC Report) at 2. No condition adjustments to the estimated base vehicle value were made, resulting in equal base vehicle and adjusted vehicle values. Ex. D (Nichols CCC Report) at 1. To the adjusted vehicle value, Defendant added vehicular sales tax of $1,134.00, a

5

title fee of $68.50, and a title handling fee of $8.00 and subtracted a collision deductible of $500.00, to arrive at a claim payment of $12,050.50.

Plaintiffs contend that USAA CIC underpaid their claims as a result of relying on the valuations in the CCC Reports. Compl. ¶¶ 26-27. Although it is not clear from the Complaint, Plaintiffs appear to base their contention on a claim that the NADA "Clean Retail" values are greater than the Adjusted Vehicle Values in the CCC Reports. *Id.*

Based on these allegations, Plaintiffs assert claims for breach of contract and violation of Louisiana's Insurance Code. Plaintiffs seek to certify a class which includes all "past and present USAA Casualty Insurance Company policyholders who have made claims against their policy for the total loss of a vehicle and had those claims undervalued through the use of the CCC One Market Valuation Report system and/or other unfair valuation tools used by USAA Casualty Insurance Company." Compl. at ¶ 50

### III. STANDARD OF REVIEW

A complaint must be dismissed upon a 12(b)(6) motion if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Twombly,* 550 U.S. at 555 (factual allegations "must be enough to raise a right to relief above the speculative level"); FED. R. CIV. P. 12(b)(6). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This burden is not met by "labels and conclusions, [or] a formulaic recitation of the elements of a cause of action" or by "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555, 557 (citations omitted). In determining whether a plaintiff has stated a claim under Rule 12(b)(6), a

court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (US), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). Notably, when an allegation is contradicted by the contents of an exhibit attached to the pleading, then the exhibit, and not the allegation, controls. *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004).

## IV.  ARGUMENT

Plaintiffs' Complaint should be dismissed because it includes only conclusory allegations that the CCC Reports fail to satisfy the requirements of Section 22:1892B(5).

Defendant's liability for a total loss under Plaintiffs' policies is limited to their respective vehicles' "actual cash value," as defined in the policies. *See* Ex. A (Sampson Policy) at 2 of 3, 15 of 26; Ex. C (Nichols Policy) at 2 of 3, 12 of 18. The Louisiana Insurance Code provides three methods for determining actual cash value:

> When an insurance policy provides for the adjustment and settlement of first-party motor vehicle total losses on the basis of actual cash value or replacement with another of like kind and quality, and the insurer elects a cash settlement *based on* the actual cost to purchase a comparable motor vehicle, such costs shall be *derived* by using one of the following:
>
> (a)  A fair market value survey conducted using qualified retail automobile dealers in the local market area as resources. If there are no dealers in the local market area, the nearest reasonable market can be used.
>
> (b)  The retail cost as determined from a generally recognized used motor vehicle industry source; such as, an electronic database, if the valuation documents generated by the database are provided to the first-party claimant, or a guidebook that is available to the general public. If the insured demonstrates, by presenting two independent appraisals, based on measurable and discernable factors, including the vehicle's pre-loss condition, that the vehicle would have a higher cash value in the local market area than the value reflected in the source's database or the guidebook, the local market value shall be used in determining the actual cash value.

7

>   (c) A qualified expert appraiser selected and agreed upon by the insured and insurer. The appraiser shall produce a written nonbinding appraisal establishing the actual cash value of the vehicle's pre-loss condition.

LSA-R.S. 22:1892B(5) (emphasis added).

### A. PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED A VIOLATION OF THE LOUISIANA INSURANCE CODE.

First, Plaintiffs fail to plead any allegations whatsoever as to how the CCC Reports do not satisfy the requirements of Section 1892B(5)(a). Plaintiffs include only the first page of each CCC Report in the Complaint, claiming the first page is the "relevant portion" of the report. *See* Compl. ¶¶ 18, 21. However, a review of the full reports, attached as Exhibits B and D, demonstrates that each CCC Report is a "fair market value survey conducted using qualified retail automobile dealers in the local market area as resources."

The CCC Reports spell out the valuation process for Plaintiffs' vehicles, based on multiple comparable vehicles in the local market area. The valuation of each vehicle factored in the options on the vehicle compared with the options on the local market comparable vehicles, as well as differences in the mileage on the Plaintiffs' vehicles and the comparable vehicles. *See* Ex. B (Sampson CCC Report) at 7-10; Ex. D (Nichols CCC Report) at 7-9. Plaintiffs' vehicles were evaluated based upon their "good" conditions, against comparable vehicles advertised in the local market that were in "clean" or "dealer retail" condition.[4]

Plaintiffs do not allege that any of the comparison vehicles on the CCC Reports were not "comparable" vehicles or that the comparable vehicles were not located in the local market area. Instead, the Complaint simply asserts, with no factual support, that the CCC Report is not a "fair

---

[4] Autotrader lists retail prices for vehicles in excellent or "clean" condition. *See In re Zambuto*, 437 B.R. 175, 178 (Bankr. D.N.J. 2010). The prices for Comparable Vehicles 1 and 3-6 on Sampson's CCC Report and Comparable Vehicles 1 and 3 on Nichols' CCC Report were reported by Autotrader, and reflect retail prices for vehicles in excellent condition. *See* Ex. B (Sampson CCC Report) at 7-10; Ex. D (Nichols CCC Report) at 7-9.

8

market survey" as authorized under Section 22:1892B(5)(a). Compl. ¶ 44. Such conclusory allegations without any factual basis are insufficient to state a plausible claim.

>    **B.     PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED THEY SUSTAINED ANY DAMAGES.**

Similarly, Plaintiffs fail to adequately allege that they have suffered injury as a result of Defendant's use of the CCC Report. The Louisiana Insurance Code requires that where an insurer elects a cash settlement "*based on* the actual cost to purchase a comparable motor vehicle, such costs shall be *derived*" from one of the statutory methods.

The meaning of "base[d] . . . on" does not mean equal to, and instead means "derived from" or the "starting point."  *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1348 (4th Cir. 1994) (qui tam action); *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1111 (9th Cir. 2000) (ERISA case); *Dep't of Motor Vehicles & Pub. Safety v. Hutchings*, 795 P.2d 497, 500 (Nev. 1990) (ruling that a Nevada statute that requires service employees' salaries to be "'set based upon' prevailing rates" does not require salaries set 'at' prevailing rates").  The word "derive" is defined as "to take, receive, or obtain especially from a specified source" and to "infer" or "deduce."[5] Simply put, actual cash value *does not* equal retail cost; rather, actual cash value is deduced or inferred based on information from one of the three statutorily accepted methods of valuation.

Plaintiffs cite the NADA "Clean Retail" value for each of their vehicles and assert that NADA and Kelley Blue Book are "generally accepted valuation tools." *See* Compl. ¶¶ 26-27, 30. While that may be true, it does not mean that CCC does not produce accurate valuations.  In fact, the United States Federal Trade Commission contended, and the United States District Court for the District of Columbia expressly found, that the CCC Report is *more accurate* than Kelley Blue Book and NADA. *FTC v. CCC Holdings, Inc.*, 605 F.Supp.2d 26, 42 (D.D.C. 2009).  This is

---

[5] "derive." *Merriam-Webster.com.* 2019. https://www.merriam-webster.com (28 August 2019).

because CCC "provides valuations in local markets, while the Books [including NADA and KBB] provide only regional data that are rarely localized." *Id*.[6] Moreover, the "valuation methodologies used by [NADA and KBB] include subjective data and do not account for all of the vehicle's options, mileage, or condition as precisely as [CCC]." *Id*. For example, the court noted, "NADA uses wholesale and retail data sets and manipulates that information using analytical modeling and judgment by its editorial staff to estimate vehicle value." *Id*.

In addition, numerous courts have recognized that the NADA "Clean Retail" value is just the *starting point* for valuation and that adjustments for, among other things, the vehicle's condition and mileage should be made. *See In re Nance*, 477 B.R. 638, 643–44 (Bankr. E.D. La. 2012) (the Clean Retail value "should be *discounted* to reflect the fact that the typical vehicle is in a condition inferior to the "clean" condition assumed by the NADA Guide's Clean Retail value."); *In re Mayland*, No. 06-10283, 2006 Bankr. LEXIS 967, at *4 (Bankr. M.D.N.C. May 26, 2006) (recognizing that few, if any, vehicles are "maintained in peak conditions"); *In re Scott*, 437 B.R. 168, 173–74 (Bankr. D.N.J. 2010) (recognizing that downward adjustments are necessary because "few vehicles are maintained in the excellent or 'clean' condition contemplated by the guide retail values"). Thus, Plaintiffs' allegations that NADA "clean retail" values for their vehicles were higher than the ACV determined by USAA are insufficient to allege an actual injury.

Moreover, Kelley Blue Book and NADA recognize that users may have to make downward adjustments to listed retail values to determine the value of a given vehicle. The Kelley Blue Book, for example, explains that retail value "is representative of dealers' *asking* prices. It assumes that the vehicle has been fully reconditioned… ." *See* Exhibit E (available at

---

[66] Plaintiffs' CCC valuation reports confirm this. Not only are the comparable vehicles actually listed for sale at local market dealerships (*see* Ex. B (Sampson CCC Report) at 7-9; Ex. D (Nichols CCC Report) at 7), but each includes vehicles actually inspected by CCC. *See* Ex. B (Sampson CCC Report) at 7; Ex. D (Nichols CCC Report) at 7, 9.

10

https://www.kbb.com/company/faq/used-cars/) (emphasis added). Kelley Blue Book also disclaims: "The final sale price *will likely be less* depending on the vehicle's actual condition, popularity, type of warranty offered and local market conditions. In other words, it's the price you should expect a dealer to ask - not always the price you should pay." *Id.* The NADA guide specifies that retail value "reflects a vehicle in clean condition…. Because individual vehicle condition varies greatly, users of NADAguides.com may need to make independent adjustments for vehicle condition." *See* Exhibit F (available at https://www.nadaguides.com/FAQ/values-and-pricing). Like the CCC Report, Kelley Blue Book and NADA, which Plaintiffs allege are "generally recognized used motor vehicle industry source[s]," recognize the need for adjustments to retail value based on individual vehicle condition.

Plaintiffs have not alleged any adjustments for the condition of the comparable vehicles in the NADA reports, as compared to theirs, other than generally alleging that the Clean Retail value was "adjusted for mileage and options." *See* Compl. ¶¶ 26-27. Though Plaintiffs allege the NADA clean retail values of their vehicles were higher than the actual cash value calculated by the CCC Reports, there are no specific factual allegations establishing how or why the "clean retail value" is equivalent to actual cash value. Further, Plaintiffs do not allege facts supporting how the use of NADA or Kelley Blue Book would have resulted in calculation of a higher total loss settlement than they received.

Plaintiffs have failed to plausibly allege that they suffered any injury caused by Defendant's use of the CCC Report sufficient to satisfy the plausible pleading standard of *Twombly* and *Iqbal*. As a result, Plaintiffs' Complaint should be dismissed.

## V. CONCLUSION

Defendant USAA Casualty Insurance Company respectfully requests that this Court grant its Motion to Dismiss Plaintiff Arthur Sampson, Jr. and Plaintiff Connie Nichols' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), as well as such further relief to which Defendant USAA Casualty Insurance Company may be entitled.

Respectfully submitted,

*/s/Christopher P. Ieyoub*
Christopher P. Ieyoub (#16978)
PLAUCHE, SMITH & NIESET
1123 Pithon Street
P.O. Drawer 1705
Lake Charles, Louisiana 70602
cieyoub@psnlaw.com
Telephone: (337) 436-0522
Facsimile: (337) 436-9637

***ATTORNEY FOR PLAINTIFF USAA CASUALTY INSURANCE COMPANY***

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2019, a true and correct copy of the foregoing document was served via ECF on all counsel of record:

| | |
|---|---|
| Kenneth D. St. Pé<br>KENNETH D. ST. PÉ, APLC<br>311 W. University Ave., Suite A<br>Lafayette, LA 70506 | Stephen B. Murray, Sr.<br>Stephen B. Murray, Jr.<br>Arthur M. Murray<br>THE MURRAY FIRM<br>650 Poydras Street, Suite 2150<br>New Orleans, LA 70130 |
| John Randall Whaley<br>Benjamin H. Dampf<br>WHALEY LAW FIRM<br>6700 Jefferson Highway<br>Building 12, Suite A<br>Baton Rouge, LA 70806 | Kenneth W. DeJean<br>LAW OFFICES OF KENNETH W. DEJEAN<br>Post Office Box 4325<br>Lafayette, LA 70502-4325 |

/s/Christopher P. Ieyoub