UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **ARTHUR SAMPSON JR ET AL** | **CASE NO.  6:19-CV-00896** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **UNITED SERVICES AUTOMOBILE ASSOCIATION** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

<u>**MEMORANDUM RULING**</u>

Before the Court is a "Motion for Class Certification (Filed Under Seal)" (Doc. 94) by Plaintiffs, Arthur Sampson, Jr. and Lovely M. Feagins, individually and on behalf of others similarly situated.  Plaintiffs move the Court for certification of the instant lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of the following class:

> **All persons insured by USAA and USAA General Indemnity Company who have made a claim for first party total loss, which claim USAA and USAA General Indemnity Company evaluated using CCC, or a predecessor product from August 15, 2010 to the present date and whose CCC Base Value was less than the NADA Fully Adjusted Value ("Clean Retail").**

Plaintiffs further move that Arthur Sampson, Jr. and Lovely M. Feagins be appointed as representatives for the above-defined class and that the following attorneys be appointed to serve as class counsel for the above-defined class;

1. J.R. Whaley
2. Kenneth D. St. Pe
3. Stephen B. Murray, Jr.
4. Kenneth W. DeJean

The Court held oral arguments on April 27, 2022, concerning the Motion for Class Certification.

## **BACKGROUND**

This lawsuit is one of several pending in United States district courts, challenging the valuation systems used by car insurers to determine cash value of vehicles on total loss claims. Plaintiffs in this matter are two Louisiana residents who had insurance policies through USAA. Under the terms of these policies, USAA agreed to pay the owner the actual cash value ("ACV") of the insured vehicle upon the occurrence of a total loss. To determine the ACV, USAA used a valuation product known as the CCC One Market Valuation Report ("CCC"), which was developed by CCC Information Services, Inc. and sold to USAA and other insurance companies.[1]

Plaintiff Sampson filed a claim under his collision coverage, after his 2012 Mazda 6 Sport was damaged in an accident occurring on or about February 8, 2017.[2] Under the CCC valuation report, USAA determined that his vehicle had a base value of $6,643.00 and adjusted value of $5,999.00.[3] Plaintiff Feagin's valuation under the CCC valuation report was $12,651.00.[4]

Plaintiffs allege, the National Automobile Dealers Association Appraisal ("NADA") Guides suggest "clean retail" values of $6,725.00 and $13,775.00 for their vehicles, respectively, after adjustments "for mileage and options."[5]

---

[1] Doc. 1, ¶¶ 7–13.
[2] *Id.* at ¶¶ 7–8, 18.
[3] *Id.*
[4] Plaintiffs' exhibit 20.
[5] *Id.* at ¶¶ 26–27.

Plaintiffs challenged the CCC valuation reports by filing suit in this Court on July 12, 2019. They allege that the CCC valuation system undervalued their vehicles by unjustifiably applying certain condition adjustments, and that USAA's intentional failure to fully compensate Plaintiffs for the loss of their vehicles amounts to a bad faith breach of contract.[6] They also maintain that USAA violated the Louisiana Insurance Code by using the CCC valuation system because it is not one of the methods under Louisiana Revised Statute 22:1892(B)(5), and violated its duty of good faith and fair dealing under Louisiana Revised Statute § 22:1973.[7] Plaintiffs seek certification on behalf of USAA policyholders who have been similarly undercompensated based on the use of CCC One Market Valuation Reports.[8]

## PLAINTIFFS' DAMAGES MODEL

Plaintiffs maintain that once the "common question" is answered affirmatively as to whether CCC's valuation method violates the statute, individual questions of damages for each class member can be resolved with a formula using the data electronically maintained by USAA.  The damages as to each class member who was paid less than what the statute mandates would be the difference paid to insured by CCC and what a system, like NADA, that complies with § 22:1895, would pay.

To the extent that loss vehicle conditioning is allowed under Louisiana law, Plaintiffs have agreed to not challenge those determinations and propose that the condition adjustments contained in the CCC reports be applied to the NADA clean retail value.  As

---

[6] *Id.* at ¶¶ 25–27, 30–39.
[7] *Id.* at ¶¶ 40–49.
[8] *Id.* at ¶¶ 50–60.

previously noted, Plaintiffs argue that § 22:1892(B)(5)(b) allows the retail value from a generally recognized used motor vehicle industry source to be adjusted only if the insured demonstrates that the loss vehicle industry condition warrants a higher value.  Plaintiffs assert that the common question is whether this provision means that Plaintiffs need not adjust NADA retail values for condition.  If Plaintiffs prevail, the issue of conditioning would be moot. However, if Plaintiffs do not prevail, meaning the Court determines that NADA values should be adjusted for condition, then the loss vehicle condition adjustments based on the USAA appraisers' inspections may be used to adjust NADA values.

Plaintiff notes that this Court has already approved this method in *Shields v. State Farm Mutual Automobile Insurance Company*, Civil Action 2:19-1359, which has been approved by the United States Fifth Circuit Court of Appeals in *Slade, supra.*

## **CLASS CERTIFICATION STANDARD**

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *California v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). "The class action is a nontraditional litigation procedure permitting a representative with typical claims to sue or defend on behalf of, and stand in judgment for, a class of similarly situated persons when the question is one of common or general interest to persons so numerous as to make impracticable to bring them all before the court." *Ford v. Murphy Oil U.S.A., Inc.*, 703 So.2d 542, 544 (La. 9/9/97), *reh'g granted in part,* 710 So.2d 235 (La. 10/10/97). "The purpose and intent of class action procedure is to adjudicate and obtain *res judicata* effect on all common issues applicable not only to the representatives who bring that action, but

to all others who are 'similarly situated,' provided they are given adequate notice … and do not timely exercise the option of exclusion." *Id*. "The only issue to be considered by the trial court when ruling on certification, . . . is whether the case at bar is one in which the procedural device is appropriate," and in doing so, "the court is not concerned with whether the plaintiffs have stated a cause of action or the likelihood they ultimately will prevail on the merits, but whether the statutory requirements have been met." *Baker v. PHC-Minden, L.P.*, 167 So.3d 528, 537 (La. 5/5/15) (*citing Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140 (1974)).

The party seeking class certification bears the burden of establishing that it is appropriate under the requirements of Federal Rule of Civil Procedure 23, by a preponderance of the evidence. *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737–38 (5th Cir. 2003). To this end the district court must "conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class." *Id.* (internal quotations omitted) At issue here are the four requirements set forth under Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) as well as Rule 23(b)(3)'s requirement that common questions predominate over individual ones.

## LAW AND ANALYSIS

Class determinations "[f]requently . . . entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Here, Plaintiff seeks certification on two claims: breach of insurance contract and penalties under Louisiana Revised Statute § 22:1973. Both claims relate to the provisions of

Louisiana Revised Statute § 22:1892 outlining acceptable methods for calculating actual cash value ("ACV") of a totaled vehicle:

> When an insurance policy provides for the adjustment and settlement of first-party motor vehicle total losses on the basis of actual cash value or replacement with another of like kind and quality, and the insurer elects a cash settlement based on the actual cost to purchase a comparable motor vehicle, such costs shall be derived by using one of the following:
>
> (a) A fair market value survey conducted using qualified retail automobile dealers in the local market area as resources. If there are no dealers in the local market area, the nearest reasonable market can be used.
>
> (b) The retail cost as determined from a generally recognized used motor vehicle industry source; such as, an electronic database, if the valuation documents generated by the database are provided to the first-party claimant, or a guidebook that is available to the general public. If the insured demonstrates, by presenting two independent appraisals, based on measurable and discernable factors, including the vehicle's preloss condition, that the vehicle would have a higher cash value in the local market area than the value reflected in the source's database or the guidebook, the local market value shall be used in determining the actual cash value.
>
> (c) A qualified expert appraiser selected and agreed upon by the insured and insurer. The appraiser shall produce a written nonbinding appraisal establishing the actual cash value of the vehicle's preloss condition.
>
> (d) For the purposes of this Paragraph, local market area shall mean a reasonable distance surrounding the area where a motor vehicle is principally garaged, or the usual location of the motor vehicle covered by the policy.

La. Rev. Stat. 22:1892(B)(5).

Additionally, Louisiana Revised Statute 22:1973 imposes on insurers a duty of good faith and fair dealing with a penalty "in an amount not to exceed two times the damages

sustained or five thousand dollars, whichever is greater." La. Rev. Stat. § 22:1973(A), (C).

It outlines several acts that, "if knowingly committed or performed by an insurer," constitute a breach of this duty. *Id.* at § 22:1973(B). These include "[f]ailing to pay the amount of any claim due . . . within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause." *Id.* at § 22:1973(B)(5).

*The CCC One Market Valuation System*

USAA equates the CCC adjusted vehicle value as ACV. The CCC one Market Value Report methodology employs a "four step" process[9] as follows:

Step 1 Identify the loss vehicles by VIN, year, make, model, trim, level, body style, and engine size.[10]

Step 2 Configure the loss vehicle using information from the insure regarding equipment, packages, mileage, condition, and refurbishments of the loss vehicle.[11]

Step 3 CCC product identifies and adjusts comparable vehicles using searches for comparable vehicles in various databases, searching in concentric circles, stating in a 50-mile radius and increasing in 50-mile concentric circles until at least two (2) vehicles are found.[12] CCC removes "outlier" vehicles on the high and low price ends, based on an internal proprietary algorithm.[13]

Step 4 Adjust for differences in configurations (package, trim, options) between the loss vehicle and the comparables[14] using CCC's proprietary algorithm based on survey data obtained from a third party, Maritz.[15]

---

[9] Plaintiffs' exhibit 2, John Gintvainis deposition, p. 82:10–84:12.
[10] *Id.* 16:9.
[11] *Id.* p. 16:18.
[12] *Id.* p. 17:10.
[13] *Id.* p. 44:25–45:13.
[14] *Id.* p. 49:3.
[15] *Id.* p. 28:14.

*Maritz survey*

Adjustments based on the Maritz survey are applied regionally, not locally.[16] In other words, they do not come from "local dealers' listing the comparable vehicles. CCC also adjusts the comparable vehicles for mileage, using an algorithm based on the Maritz survey.[17] CCC applies a condition adjustment to the comparable vehicles (the Comparable Vehicle Condition Adjustment), which purports to set that comparable vehicle to a common condition baseline.[18] Based on the Maritz survey, the dealer derived comparables are adjusted downward to equate their condition to a baseline of "good" ("average private party") condition.[19]

For example, Sampson's comparables were reduced $894 and Feagins' comparables were reduced $768 from their list price.[20] Plaintiffs allege that the Comparable Vehicle Condition Adjustment is not compliant with Louisiana Revised Statute 22:1892B(5)(b) because it drives the comparables' "adjusted value" down. Plaintiffs contend that by adjusting retail prices to make them equivalent to "private party sale", the system failed to provide "retail cost" as required by the statute.

*Further loss vehicle condition adjustments*

Once all of the comparables have been "adjusted" for vehicle configuration, mileage and baseline condition, the adjusted vehicle values are given a weighted average, using a proprietary algorithm to produce the CCC Base vehicle value. CCC then adjusts the CCC

---

[16] *Id.* p. 39:8.
[17] *Id.* p. 56:24.
[18] *Id.* p. 59:22–60:6.
[19] *Id.* p. 61:25–62.
[20] Plaintiffs' exhibit 19, Arthur Samson CCC report; Plaintiffs' exhibit 20, Lovely Feagins' CCC report.

Base vehicle value according to the specific condition of the loss vehicle, as compared to a vehicle in "good" or "average private party condition." The CCC Base vehicle value is adjusted upward or downward depending on whether the loss vehicle is in better or worse condition than "good" or "private party condition."  The condition of the loss vehicle is scaled as either fair, good, very good, or excellent;[21] once scaled, CCC adjusts the dollar value either positively or negatively using an algorithm proprietary to CCC, based off Maritz survey results.[22]

In addition to the loss vehicle condition adjustment, if the adjuster finds the loss vehicle has prior damages, the Base vehicle value will be further reduced by the cost to repair the prior damage. The lost vehicle condition adjustment and unrelated prior damage is Step four which yields the Adjusted Vehicle Value. Both Sampson's and Feagins' vehicles were found to be in "good" condition resulting in no loss vehicle condition adjustment.[23]

*CCC system valuations versus "generally recognized used motor vehicle industry source"*

Plaintiffs contend that in the vast majority of cases, the CCC system valuation provides substantially lower valuations than that of a "generally recognized used motor vehicle industry source," such as NADA. For example, Feagins' evaluation under the CCC One Market Valuation Report was $12,651,[24] whereas the NADA clean retail value for the

---

[21] Plaintiffs' exhibit 2, Gintvainis deposition, pp. 24:8–11 and 25:7–10.
[22] *Id.* pp.  31:8–11; 46:21–24; 32:15–33:10.
[23] Plaintiffs' exhibit 19, Sampson CCC report, p. 6; Plaintiffs' exhibit 20 Feagins CCC report, p. 6.
[24] Plaintiffs' exhibit 20.

vehicle was $13,775.[25]    Sampson's evaluation under the CCC One Market Valuation Report was $5,999[26], whereas the NADA clean retail value was $6,725.[27]

*Ascertainability*

"The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Fire & Cas. Co.*, 501 F.3d 443,445 (5th Cir. 2007). "An identifiable class exists if its members can be ascertained by reference to objective criteria." Manual for Complex Litigation (Fourth) § 21.222 (2018). Plaintiffs bear the burden and cost of identifying class members. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 356 (1978).

Plaintiffs maintain that class members are ascertainable by reference to USAA's and CCC's claim records, and the information necessary to identify class members is available in a searchable database. In addition, information needed to determine who is entitled to damages is either contained in searchable databases, or by administrative means using information contained in computer records. Plaintiffs remark that the Fifth Circuit has approved similar processes in both *Mitchell v. State Farm Fire Cas. Co.*, 954 F.3d 700 (5th Cir. 2020) and *Slade v. Progressive Security Insurance Company*, 2014 WL 6484588 (W.D. La. Oct. 31, 2014).

USAA maintains that the data necessary to identify class members is not readily available.   USAA asserts that it does not maintain CCC Base Values of condition adjustments as Plaintiffs suggest. However, USAA's corporate representative explained

---

[25] Plaintiffs' exhibit 22.
[26] Applying Sampson's loss vehicle adjustment for $464 of prior damages still resulted in a $262 lower valuation.
[27] Plaintiffs' exhibits 19 and 23.

that even though it would be costly, it might be able to create a new process that would extract the appropriate data points from each class member's .pdf  CCC's report.[28]

USAA also maintains that it does not maintain NADA historical values for USAA total loss claims, and it is uncertain as to whether a spreadsheet could be generated from CCC's database.[29]  The NADA value is only stored as to an individual insured's loss.[30]

USAA also challenges Plaintiffs' suggestion that the NADA values could be procured manually through a NADA subscription service. Defendants remark that it took Plaintiffs' expert Nicole Zakowicz four minutes per vehicle to generate a report of 105 sample claims based on the date of loss, VIN, and region listed in the insured's unique CCC report.[31] Hence, USAA suggests that using Plaintiffs' estimate of 20,000 class members, it would take 166.7 eight-hour days to procure NADA values for the entire class.

USAA remarks that the VIN-based values available from NADA's subscription service do not consider the same set of potential options when determining vehicle values, thus creating more individualized litigable issues. USAA notes that Plaintiffs' expert Ms. Zakowicz could not determine from the CCC Report which particular NADA options should or should not have been selected.[32]

The Court has reviewed Ms. Zakowicz's deposition and notes that she testified that out of 105 vehicles, she was able to pull from the NADA subscription service, 100 vehicles which included the options.  However, as to the vehicles that were pulled from NADA

---

[28] Plaintiffs' exhibit 1, David Penn deposition, pp. 21:3–8, 22:15–19, 34:4–35:1.
[29] Plaintiffs' exhibit 2, John Gintvainis deposition pp. 87:19–25.
[30] Id. at 88:10–18.
[31] Plaintiffs' exhibit 26, Nicole Zakowicz deposition, pp. 152:14–153:6.
[32] Id. at pp. 179:1–187:6.

using the make, model and year, as opposed to the VIN#, Ms. Zakowicz was uncertain as to whether the CCC report would contain all of the information necessary to select the applicable option for the NADA manual system.[33]   The Court finds that Defendant's concerns would not preclude Plaintiffs' from adequately defining the class.  Furthermore, the Plaintiffs will bear the cost of identifying class members, and Ms. Zakowicz testified that she was able to obtain all necessary data to create the relevant spreadsheet.[34]

*Numerosity*

"To satisfy his burden with respect to this prerequisite, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members."  *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981). The focus under Rule 23(a) is "whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Id.* at 1038. (*quoting Phillips v. Joint Legislative Comm.*, 637 F.2d 1014, 1022 (5th Cir 1981). Relevant factors to consider in deciding whether joinder is impracticable include the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999).

Plaintiffs argue that the class is too numerous to be joined.  Plaintiffs remark that based on discovery responses by USAA, there are over 10,000 insureds in Louisiana with total loss claims evaluated with CCC for the USAA General Indemnity Company, and a

---

[33] *Id.* p. 186.
[34] *Id.* p. 161:8–18.

similar search and spreadsheet can be created for the USAA entity, which Plaintiffs believe will have about the same amount. Defendants do not challenge the numerosity and therefore the Court finds that this requirement has been met.

*Commonality*

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Plaintiffs maintain that they can demonstrate by common proof that USAA violated the requirements of Louisiana Revised Statute § 22:1892. Plaintiffs assert several theories as to why the CCC valuation method violates § 22:1892.

Plaintiffs allege that total loss payments calculated by CCC are not derived from "[a] fair market value survey conducted using qualified retail automobile dealers in the local market area as resources," as required by Louisiana Revised Statute § 22:1892(B)(5)(a). "Local market area shall mean a reasonable distance surrounding the area where a motor vehicle is garaged, or the usual location of the vehicle covered by the policy." Louisiana Revised Statute § 22:1892(B)(5)(d).

Plaintiffs argue that expanding the search area concentrically for comparables does not satisfy the statute because values are being considered outside the local market area. More importantly, Plaintiffs argue that CCC's various proprietary algorithms which drive adjustments for the mileage, base-line condition, and options are based on nonlocal data and are completely unrelated to the comparables found in the search. Plaintiffs remark that CCC did not use the "qualified retail automobile dealers in the local market area" as its "resources" for the data used to develop the proprietary algorithms it used to reduce the comparable vehicle values obtained from its selective sample of comparables.

Next, Plaintiffs argue that CCC'S valuation method does not comply with the alternative  means of valuation provided by Louisiana R.S. § 22:1892(B)(5)(b) because it does not provide the "retail cost as determined from a generally recognized used motor vehicle industry source, such as, an electronic database," nor are the valuation documents generated by the database  or a guidebook provided to the first-party claimant or the general public. In other words, CCC is not a "generally recognized used motor vehicle industry source" because consumers do not have access to the program as a source. Furthermore, the valuation documents generated by the database, and the CCC calculations regarding mileage, options, condition adjustments and unrelated prior damage are not provided to the first party claimant as required by Louisiana Revised Statute § 22:18920(B)(5)(b).

 Alternatively, Plaintiffs maintain that the CCC valuation violates the statute because Louisiana Revised Statute 22:1895(B)(5)(b) allows the insured to present two independent appraisals, and if said appraisals have a higher cash value in the local market area than the value reflected in CCC source's database or the guidebook, the local market value is used in determining the actual cash value.

The Court finds that Plaintiffs has satisfied the common question requirement by common proof that USAA violated the requirements of Louisiana Revised Statute § 22:1892.

*Predominance*

For class actions seeking money damages, Rule 23(b)(3) also requires that common questions "predominate over any questions affecting only individual members," effectively superseding the commonality requirement with a "far more demanding" standard. *Unger*

*v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)). The predominance element requires the court to consider "how a trial on the merits would be conducted if a class were certified," including "identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class." *Madison v. Chalmette Refining, LLC*, 637 F.3d 551, 555 (5th Cir. 2011) (internal quotations omitted). The goal of this process is to "prevent[] the class from degenerating into a series of individual trials." *Id.*

As the Fifth Circuit recently emphasized, a need to calculate damages on an individual basis will not necessarily preclude class certification. *Mitchell*, 954 F.3d at 710–11 (5th Cir. 2020). The issue turns on whether the damages of each plaintiff can be determined by mathematical or formulaic calculation. *Id.* Where the claims "focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential that the class action may degenerate in practice into multiple lawsuits separately tried renders class treatment inappropriate." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) (cleaned up).

Plaintiffs argue that the issues common to the class overwhelmingly predominate over any purported individual issues contemplated because the transactions at issue are uniform in all pertinent respects.  Plaintiffs assert that the Court will resolve the issues in the case by uniformly applying objective computer data.

USAA argues that individual inquiries would be required to determine which class members were actually underpaid. USAA remarks that the actual value of a total loss

vehicle is not equal to its NADA Clean Retail Value because NADA does not purport to offer specific valuations for specific vehicles. *See Gauthreaux v. USAA Cas. Co.*, 2001 WL 65573, at *4 (E.D. La. Jan. 25, 2001). Moreover, NADA values must be adjusted "to reflect the fact that the typical vehicle is in a condition inferior to the 'clean' condition assumed by the NADA Guide's Clean Retail value," *In re Nance*, 477 B.R. 638 643–44 (Bankr. E.D. La. 2012) depending on the vehicle's make, model, model, mileage, trim, options and condition.

USAA suggests that in order for Plaintiffs to prove that an insured was paid less than their contract or the statute requires, Plaintiffs must prove with evidence that they were paid less than the "actual cash value" of their unique vehicle at the time of loss, accounting for the actual condition of that vehicle. Therefore, according to USAA, Plaintiffs would have to introduce unique and particularized evidence about the condition and value of their own vehicle, that it was worth more than they were actually paid, and USAA would be entitled to present contrary evidence about the value and condition of each individual vehicle to prove that there was no underpayment.

Plaintiffs suggest that this case is the same as *Shields* wherein this Court granted plaintiff's Motion for Certification after finding that common issues predominate over individual issues and class action treatment was the superior method for resolving the claims.  In *Slade, supra,* the court concluded that once the common questions of fact have been resolved, the remaining issues could be resolved by reference to the defendant's own computer data. Specifically, if it is shown that NADA is a generally recognized used motor vehicle, and the challenged proprietary product (here, CCC) is not, then the determination

of each individual class member's entitlement will be a matter of comparing the NADA value (either already contained in the insurer's data or derived from that data) to the CCC valuation and finding the difference. If Plaintiffs show that CCC misused its condition evaluations, adjustments could be made to the valuations in accordance with those findings. Relying on *Slade,* and *Shields,* Plaintiffs maintain that resolution can be achieved by revising the computerized system to apply the data properly.

USAA argues that the CCC condition adjustments cannot be used to adjust clean retail values from NADA.[35]  USAA informs the Court of the differences between the CCC values and the NADA values.  CCC uses list prices from franchise and nonfranchise dealers, whereas NADA's values are derived from transaction prices of franchise dealers. In addition, each company uses different geographic regions to generate their values. Thus, USAA posits that it cannot be assumed that applying CCC's condition adjustments to NADA would provide accurate values for any particular used vehicle.

Plaintiffs maintain that the question of whether NADA is the correct measure of the value of Plaintiffs' vehicles is a common merits questions not to be resolved at the class certification stage.

The focus at this stage is on whether the model, if correct, measures the damages that are brought on behalf of the class. *Comcast v. Behrand*, 569 U.S. 27, 133 S.Ct. 1426 (2013).  In *Slade,* the court found that comparing the values reached using the defendant's allegedly unlawful model to values reached using NADA, satisfied the *Comcast* standard.

---

[35] See Defendant's exhibit C, Tom Ryan Report, p. 5; *See* Defendant's exhibit Q, Gintvainis Declaration ("any comparison between NADA's values and CCC's values, or any attempt to link NADA's values to CCC's adjustments, would be like comparing apples and oranges.) *Id.* ¶ 49.

Likewise, here, USAA's challenge also involves a merits question not necessary to the class certification inquiry. Be that as it may, NADA is one lawful method of determining ACV under § 22:1895(B)(5), and thus provides a lawful measure for determining who might have suffered economic harm if it is found that USAA's use of CCC's proprietary method to determine ACV was unlawful.

Next, USAA argues that there are individualized inquiries as to each class member because USAA would be permitted to introduce evidence of other lawful valuation sources to show that it paid as much or more than legally required. Indeed, Defendant has presented evidence to show that some insureds included in Plaintiffs' class definition are unharmed because they were paid more than a different lawful amount, such as Kelly Blue Book ("KBB").[36] USAA further challenge class members' Article III standing who were actually paid more than a statutorily permissible value (using other guidebooks such as KBB, Edmonds, Blackbook, Manheim Market Reports, etc.). USAA argues that because they were paid more than a statutorily permissible value, they have no injury, and thus no standing.

Plaintiffs note that they have limited the class to those who have suffered damages under their proposed damage model—the same approach this Court took in *Shields*.[37] In *Shields*, this Court excluded individuals who received more based on the Autosource-derived ACV than they would have under NADA.

---

[36]  Defendant's exhibit 8, Walker Report, ¶ 40.
[37] The class is limited to those "whose CCC base Value was less than NADA Fully Adjusted Value." Doc. 94–1, p. 13, 20.

USAA also argues that there is a conflict between the class members and potential future total loss victims because many current insureds who suffer a total loss in the future would receive higher valuations from CCC than from NADA. However, as noted by Plaintiffs, the class has not sought declaratory relief and future claimants are not members of the class.

Next, USAA argues that individualized issues relating to USAA's accord and satisfaction defense preclude class certification. USAA asserts that of the 105 sample of claim files produced, several individuals eventually agreed to a settlement with USAA. USAA suggests that individualized hearings would be required to resolve issues related to the viability of any affirmative defense asserted. *Bauer v. Dean Morris, L.L.P.*, 2011 WL 3924963, at *7 (E.D. La. Sept. 7, 2011); *see also In re Katrina Canal Breaches Consol. Litig.*, 258 F.R.D. 128, 137 (E.D. La. 2009).

"Predominance requires a qualitative assessment; it is not bean counting." *Toney v. Qual. Res., Inc.*, 323 F.R.D. 567, 586 (N.D. Ill. 2018) (quoting *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013)). Affirmative defenses are relevant to the court's predominance inquiry under Rule 23(b)(3), and the predominance of individual issues under such a defense may defeat certification. *E.g.*, *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008). At the same time, affirmative defenses are often easy to resolve and district courts have several tools for managing them. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1240–41 (11th Cir. 2016). Accordingly, when "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important

matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453–54 (2016) (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005)).

As noted in *Shields*, USAA can test the viability of this defense as to each Plaintiff through limited discovery and USAA can attempt decertification if it uncovers greater evidence of variation against a sub-class supported by documentary proof of compromise. The availability of the defense, however, is not enough for the Court to determine that it overrides the common issues of liability on all claims and injury in the redefined class.

Finally, USAA maintains that individualized damages issues pervade Plaintiffs' statutory damages claims, noting that statutory damages authorized by Louisiana Revised Statute § 22:1973 are not "calculated based on amounts due under the insurance contract," citing *Durio v. Horace Mann Ins. Co.*, 74 so.3d 1159, 1170 (La. 2011). USAA posits that because recoverable damages under § 22:1973 stem from the breach of the insurer's duty of good faith, the amount of the penalty cannot be resolved on a class-wide basis. *Defraites v. Mut. Auto. Ins. Co.*, 864 So.2d 254 (La.App. 5 Cir. 2004)

Plaintiffs maintain that the *Defraites* holding has been rejected by *Oubre v. Louisiana Citizens Fair Plan,* 961 So.2d 504, 509 (La.App. 5th Cir. 2010) which held that "[t]he *Defraites* case does not stand for the proposition that claims for failure to comply with statutory obligations to initiate loss adjustment must be assessed on an individual basis in every situation." *Id.* Instead, the court must look to the nature of the claims being asserts. In *Gautreaux v. Louisiana Farm* Bureau, 280 So.3d 694, 705, (La.App. 3d Cir. 10/2/19)

*writ denied,* 296 So.3d 1068 (La. 6/3/2020), applying *Dupree v. Lafayette Ins. Co.*, 51 So.3d 673, 699 (La. 2010), the Louisiana Third Circuit found that claims for penalties for violations of the express requirements of Louisiana Revised Statute 22:1892B(5), the identical claims asserted here, are appropriate for class certification.

The Court finds that the question of whether USAA's use of CCC's method of determining ACV of loss vehicles was a violation of its duty to fairly adjust claims under § 1892, is a question that can be answered class-wide and thus meets both the commonality and the predominance requirements.

*Typicality and Adequacy*

Under Rule 23(a)(3), the named representative's claims must be typical of those of the class. This requirement is not demanding and "focuses on the similarity between the named plaintiff's legal and remedial theories and the theories of those whom they purport to represent." *Mullen*, 186 F.3d at 625. "When the claims permeate from a similar course of conduct or transaction and share the same legal theory, factual differences will not defeat typicality." *Chauvin v. Chevron Oronite Co., LLC*, 263 F.R.D. 364, 369 (E.D. La. 2009).

Plaintiff must prove that "the claims or defenses of the representative parties are typical of the claims of defenses of the class." Federal Rule of Civil Procedure 23(a)(3). Typicality, like commonality, serves as a guidepost "for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 350 n. 5 (2011) (internal quotation marks omitted). The typicality requirement is designed only

to protect absent class members by ensuring that a class representative pursues their interests. *Gen. Tele. Co. of Southwest v. Falcon*, 457 U.S. 147, 158 n. 13,102 S.Ct. 2364 (6/14/1982).

Relatedly, the named plaintiff must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between the named parties and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625. In the Fifth Circuit, adequacy encompasses three separate but related inquiries: (1) "the zeal and competence of the representative[s'] counsel;" (2) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees;" and (3) the risk of "conflicts of interest between the named plaintiffs and the class they seek to represent." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005) (quoting *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 479–80 (5th Cir. 2001)).

USAA argues that a portion of the class members would be at a disadvantage because they received payments above the alleged unlawful allegation, therefore, the class representatives are not adequate, nor typical, citing *Prudhomme v. GEICO*, Civ. Action 15-cv-98 (W.D. La. 12/22/2020). In *Prudhomme*, one-fifth of the putative class benefited from GEICO using the CCC value instead of the NADA Clean Retail Value.

USAA specifically challenges Plaintiff, Sampson, because of his unique defense of accord and satisfaction, which USAA asserts will consume a significant portion of time and energy at trial without any benefit to other class members. As noted in *Shields*, a compromise must be in writing, and signed by both the offeror and an acceptance by the

offeree. Here, as in *Shields,* there is no clearly expressed written compromise that acceptance of the payments will extinguish the obligation.

Plaintiffs argue that by limiting the class to those who suffered damages under their proposed model, any such conflicts have been resolved. Plaintiffs, Feagins and Sampson, allege the same injury as absent class members because USAA used the CCC system to value total losses as the basis for its first offer of settlement.  Plaintiffs' claims arise from their alleged underpayment through USAA's use of the CCC system, which Plaintiffs allege violates § 1892.

The Court finds that Plaintiffs, Feagins and Sampson, adequately represent the class and that their claims are typical of any putative class member.

*Superiority*

Under Rule 23, the court is also required to find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This inquiry is fact-specific and depends on the circumstances of each case. *Ibe v. Jones*, 836 F.3d 516, 529 (5th Cir. 2016). The court looks to the following factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

In evaluating superiority, the court considers the likely difficulties in managing the case, specifically, "the whole range of practical problems that may render the class action

format inappropriate for a particular suit." *Eisen*, 417 U.S. at 164. The most compelling rationale for finding superiority in a class action is the existence of a negative value suit. *Castano v. Am. Tobacco Co.*, 84 f.3d 734, 748 (5th Cir. 1996). "A negative value suit is one in which the 'stakes to each member are too slight to repay the cost of the suit.'" *Walton v. Franklin Collection Agency, Inc.*, 190 F.R.D. 404, 412 (N.D. Miss. 2000) (internal citation omitted).

Plaintiffs argue that the claims at issue here have a "negative value" (Sampson's claims is less than $275 and Feagins' claim is less than $1,200). USAA has not challenged the superiority requirement.  Accordingly, the Court finds that this requirement has been met.

## CONCLUSION

For the reasons set forth above, the Motion for Class Certification will be **GRANTED.**

**THUS DONE AND SIGNED** in Chambers on this 3rd day of May, 2022.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**